UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ATP OIL & GAS CORPORATION, INC.** | **CIVIL ACTION** |
| **VERSUS** | **NO: 08-1514** |
| **DEPARTMENT OF THE INTERIOR; MINERALS MANAGEMENT SERVICE; KEN SALAZAR (PREVIOUSLY DIRK KEMPTHORNE), SECRETARY OF THE DEPARTMENT OF INTERIOR; WALTER D. CRUICKSHANK (PREVIOUSLY RANDALL B. LUTHI), ACTING DIRECTOR OF THE MINERALS MANAGEMENT SERVICE; AND LARS HERBST (PREVIOUSLY CHRIS C. OYNES), REGIONAL DIRECTOR OF THE GULF OF MEXICO OCS REGION MINERALS MANAGEMENT SERVICE** | **SECTION: "S" (1)** |

## ORDER AND REASONS

**IT IS HEREBY ORDERED** that ATP Oil & Gas Corporation, Inc.'s motion for

summary judgment is **DENIED**. (Document #37.)

**IT IS FURTHER ORDERED** that the cross-motion for summary judgment of the

Department of the Interior; Minerals Management Service; Ken Salazar, Secretary of the

Department of the Interior; Walter D. Cruickshank, Acting Director of the Minerals Management Service; and Lars Herbst, Regional Director of the Gulf of Mexico OCS Region, Minerals Management Service, is **GRANTED**. (Document #44.)

## I. BACKGROUND

On January 4, 2008, the Interior Board of Land Appeals of the Office of Hearings and Appeals of the United States Department of Interior (the Board), issued a decision affirming the August 29, 2006, decision of the Minerals Management Service (MMS), denying ATP's request for a Suspension of Operations (SOO) of Lease OCS-G 16662 (the lease), Mississippi Canyon Area, Block 943, OCS Federal Waters, Gulf of Mexico, Offshore Louisiana. ATP filed a complaint against the Department of the Interior; Minerals Management Service; Ken Salazar, Secretary of the Department of the Interior; Walter D. Cruickshank, Acting Director of the Minerals Management Service; and Lars Herbst, Regional Director of the Gulf of Mexico OCS Region, Minerals Management Service[1], seeking judicial review of the Board's decision.

ATP alleges the following underlying facts. On February 10, 2006, as a result of a shortage of drilling rigs in the offshore oil and gas industry, exacerbated in the Gulf of Mexico Outer Continental Shelf by Hurricanes Katrina and Rita, MMS sought to ameliorate the harsh

---

[1] The defendants are substituted as parties, pursuant to Federal Rule of Civil Procedure 25(d)(1). The previous defendants were the Department of the Interior; MMS; Dirk Kempthorne, Secretary of the Department of Interior; Randall B. Luthi, Director of the MMS; and Chris C. Oynes, Regional Director of the Gulf of Mexico OCS Region Minerals Management Service.

effects of lease termination by implementing "Notice to Lessees (NTL),"[2] a temporary policy granting suspensions based on "a total lack of rigs capable of drilling prior to lease expiration." See Exh. 1, Administrative Record, BNTL No. 2006-G02, Suspensions of Operations Based on Rig Delays, Lack of Rig Availability and Procurement of Long Lead Equipment," effective February 10, 2006 to February 28, 2007.[3]

NTL No. 2006-G02 was issued for the following stated purpose:

to provide guidance to our existing authority for approving requests for lease or unit Suspensions of Operations (SOO's) based on rig delays and to implement a temporary policy for granting SOO's based on a lack of rig availability and for unanticipated time frames needed to secure long lead equipment such as high pressure/temperature tubulars and wellheads.
. . . .
Currently, pursuant to 30 CFR 250.175(a), an SOO may be granted to extend the term of a lease when a drilling rig was contracted and scheduled to begin leaseholding operations prior to the lease expiration but due to reasons beyond your control, the rig was delayed. . . . It is expected that you have an approved

---

[2] Notice to Lessees are formal documents that provide clarification, description, or interpretation of a regulation or OCS standard, provide guidelines on the implementation of a special lease stipulation or regional requirement, provide a better understanding of the scope and meaning of a regulation by explaining MMS interpretation of a requirement or transmit administrative information such as changes of address or telephone numbers.

[3] NTL 2006-G02 expands the suspension provided in NTL 2000-G17:

The existing regulations, particularly, 30 CFR 250.175, allow us to grant an SOO when diligent efforts to commence drilling operations are delayed by unforeseen circumstances such as adverse weather, unavoidable accidents, or short delays in prearranged rig release date. We may grant an SOO when necessary to allow you time to begin drilling or other lease holding operations when circumstances beyond your control prevent you from conducting such operations. A fundamental component in determining whether or not you are "prevented beyond your control" is whether or not the particular drilling rig was scheduled to conduct operations at your location before the lease expiration date.

> plan (*e.g.* EP, DPP, etc.) and an approved APD.[4]  Likewise, MMS may approve SOO's when you can demonstrate that long lead equipment was contracted and scheduled to arrive in time to commence a lease holding operation prior [to] the lease expiration date but was delayed for reasons beyond your control.
> . . . .
> In addition to the delays described above, an SOO request may be approved under a temporary policy established by this NTL when you can demonstrate to MMS's satisfaction that a <u>timely</u> search has resulted in a total lack of rigs capable of drilling prior to lease expiration.  In such a case, an SOO will be considered to allow time for the first available rig to commence operations, provided a drilling contract has been executed prior to lease expiration.  The SOO request must include:
> (1) full details, with supporting documentation, demonstrating that a timely rig search was performed,
> (2) verification that a rig contract has been executed prior to lease expiration, and
> (3) the anticipated date for the rig to arrive on location and commence operations.
>
> Likewise, under this temporary policy, MMS may approve SOO's when you can demonstrate that timely attempts to secure long lead equipment needed for the commencement of leaseholding operations <u>prior</u> to lease expiration were unsuccessful.  MMS encourages you to contact our office upon learning that your "timely attempts" were not sufficient.  In such cases, before an SOO can be granted, a contract must have been executed for the timely delivery of the long lead equipment and the request must include the expected delivery date and an explanation why such equipment will not be delivered prior to lease expiration.  Late attempts to secure a drilling rig contract or long lead equipment will not be justification for an SOO approval.

Admin. Rec., doc. #1.

ATP serves a particular niche in the offshore oil and gas industry by bringing leases into production on a short turn-around when the original lessee foregoes drilling and development late in the lease's life.  The Mississippi Canyon Block 943 is a lease that was not developed by its original operator.  It presents special engineering and logistical difficulties because of its deepwater location.  In the Spring of 2006, ATP acquired the lease and pursued retaining of a

---

[4]  An EP is an Exploration Plan, and an APD is an Application for Permit to Drill.

4

drilling rig to begin operations before the end of the primary term. ATP communicated often, sometimes daily, with the MMS personnel on the status of its preparations. On June 1, 2006, ATP entered into a domestic daywork drilling contract in which Diamond Drilling Company agreed to furnish the OCEAN QUEST to drill the well. During the last weeks of preparations to begin operations, ATP encountered obstacles which prevented it from drilling prior to July 31, 2006, the expiration date of the primary term. Those obstacles included unexpected technical limitations, which made the rig available only for drilling the shallow first section of the well, but not drilling to total depth; the addition of considerable time to develop a mooring program by which the rig would be moored or anchored in place, which must be approved by the OCS MMS; modification of the listing of the rig in the MMS electronic system; and loop currents in the area where the OCEAN QUEST was working and in the area of the lease, which precluded the transportation and relocation of the OCEAN QUEST. ATP informed MMS that it was pursuing an alternate strategy of contracting another rig.

ATP submitted a request to MMS on July 25, 2006, for a SOO to maintain the lease past its scheduled expiration date. In the request for a SOO, ATP stated:

> ATP has a rig, the Diamond "Ocean Quest," under contract that has limits to its capability of completing the drilling of the planned well; however, ATP plans to utilize the rig to "spud" the well to hold the lease. ATP has presented the proposed plan and received confirmation from Mr. Don Howard, MMS Regional Supervisor, that spudding the well would constitute "lease hold operations." Additionally, ATP has submitted a revised exploration plan (REP)[5] which is

---

[5] A revised EP must be submitted to change the type of rig to be used. 30 C.F.R. § 250.283. Once a revised EP is submitted, MMS determines within 15 business days whether the EP has been submitted and acts on it within another 30 days. 30 C.F.R. §§ 250.231, 250.233. ATP was on notice that it had to submit a revised EP because the earlier approved EP was for a

5

pending approval but expected to be approved by 26 July 2006 and an APD
which has been submitted via e-Well at the time of this letter request.

Admin. Rec., doc. #2 (citing doc. #30 under seal).

MMS did not approve the SOO, EP or APD prior to the July 31, 2006, lease expiration date.[6] During the month of August, ATP attempted to obtain the services of another rig, the *Marianas,* and MMS waited to be advised of some option by which ATP could maintain the lease by drilling. On August 17, 2006, ATP and MMS representatives met, and MMS granted ATP another week to contract for use of the *Marianas* to drill the well to total depth and committed to grant the SOO if the efforts were successful. ATP was unable to obtain the contract for the *Marianas.*.

After the meeting of August 17, 2006, one of the MMS representatives who attended the meeting sent the following e-mail to the representatives in attendance and eleven other MMS personnel:

> After the meeting we just had with ATP, I cannot agree with the tentative decision to grant an SOO. . . . I am not clear as to their explanation for not pursuing approval. . . . I thought they indicated that they were trying to determine whether to use a 4-point or 8-point mooring system and that caused the delay in the POE/APD submittal.
>
> In my opinion, if that was the case, they are either *incompetent or purposely*

---

drillship rig, but the OCEAN QUEST is a semi-submersible rig, requiring a revised EP. ATP did not comply with the regulations governing EPs until July 20, 2006,when it submitted a revised EP.

[6] MMS cannot approve an EP until the state approves it under its Coastal Zone Management Act or until twenty-one days have elapsed from the time the governor of the state receives the EP. 30 C.F.R. § 250.232(b). A lessee must obtain approval of an EP before it may submit an APD. 30 C.F.R. § 250.231(a).

6

> *trying to mislead us. . . .* I think it was a *case of ATP just being ATP* and
> submitting the requests at the last minute and figuring that should be good enough
> to get an SOO. (emphasis added)

By letter of August 29, 2006, the MMS Regional Supervisor denied ATP's request for a SOO. MMS relied on NTL 2000-G17 and NTL 2006-G02, stating that ATP had not shown that a drilling rig was scheduled to begin operations prior to the lease expiration date and that there was not an approved EP and APD.

On October 13, 2006, ATP filed a notice of appeal of the MMS denial of a request for a SOO, citing the new policy established by NTL 2006-G02 and its requirements. ATP argued that 1) MMS has the authority to issue a SOO when there are reasons that prevent drilling and operations that are beyond the applicant's control; 2) NTL 2006-G02 recognizes that lack of rig availability after Hurricane Katrina is a reason beyond the applicant's control; 3) prior approval of an EP or APD is not a condition for a SOO; 4) loop currents, a bad storm season forecast, and drilling rig delays were beyond ATP's control; 5) MMS was biased; and 6) MMS's silence regarding the prerequisites is a *de facto* approval of the SOO. On December 15, 2006, ATP filed a request for a hearing before an ALJ, pursuant to 43 C.F.R. § 4.415.

On January 4, 2008, the Board issued its decision denying ATP's request for a hearing and affirming the MMS's August 29, 2006 denial of ATP's request for a SOO. The Board held that MMS acted within its authority under 30 C.F.R. § 250.175(a).

ATP filed a complaint for judicial review, alleging that the Board's decision is arbitrary, capricious, and an abuse of discretion, in violation of 5 U.S.C. § 706(2)(A), because it failed to consider the new standards for assessing requests for SOOs established after Hurricanes Katrina

7

and Rita (count one); the Board failed to follow its on rules and regulations, in violation of § 706(2)(A) (count two); the Board abused its discretion in failing to examine significant factual and legal issues and to articulate a rational basis for denying a hearing (count three); and the Board arbitrarily dismissed ATP's argument based on the nonexistent requirement of an EP and an APD and failed to follow its own regulations and conduct a substantial inquiry (count four). ATP requests that the court set aside the Board's decision and render a decision granting the SOO. Alternatively, ATP requests that the court remand the matter to the MMS for reconsideration, order the Board to refer the action to an ALJ for an evidentiary hearing, and retain jurisdiction to ensure compliance.

ATP filed a motion for summary judgment, and the defendants filed a cross-motion for summary judgment.

## II. DISCUSSION

### A. Legal standard

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Amburgey v. Corhart Refractories Corp., 936 F.2d 805, 809 (5th Cir. 1991); Fed. R. Civ. P. 56(c). If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial. Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986). The nonmovant cannot satisfy the summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. Little v. Liquid Air Corp.,

37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

**B. Administrative Procedure Act.**

The Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331-56, "vests authority for administering federal OCS mineral leases in the Secretary of the Interior." OXY USA, Inc. v. Babbitt, 122 F.3d 251 (5th Cir. 1997); 43 U.S.C. § 1334. Oil and Gas leases on the OCS run for either five years, or ten years in the case of leases located in deep water areas of the Gulf of Mexico. 43 U.S.C. § 1337(b)(2). The lease continues after the initial period as long as oil and gas is produced in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are being conducted. 30 C.F.R. § 250.180(a)(2). During the initial lease term, a lessee may request a suspension of operations to extend the initial term by a period equivalent to the term of suspension. 30 C.F.R. § 250.169(a). MMS may grant a suspension of the lease term under certain circumstances. 30 C.F.R. § 250.175(a).

"Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. "On review of an agency adjudication, however, the reviewing court must in general affirm the decision unless the agency's action was arbitrary, capricious, or otherwise not in accordance with law." Amoco Production Co. v. Lujan, 877 F.2d 1243, 1248 (5th Cir. 1989); 5 U.S.C. § 706(2)(A). The court "must honor the agency's interpretation of the law authorizing agency action so long as the interpretation is a reasonable one." Id. The court gives even greater deference to "an agency's interpretation of its own administrative regulation" than to its interpretation of a statute it is charged with administering. McDonald v. Watt, 653 F.2d 1035, 1041 (5th Cir. 1981).

9

**C. Arbitrary, capricious, and not otherwise in accordance with the law**

    **1. Board's failure to engage in a substantial inquiry and follow rules and regulations**

ATP contends that the Board's decision not to grant a SOO was arbitrary, capricious, and otherwise not in accordance with the law because it rubber-stamped the MMS's original denial of ATP's request for a SOO without conducting meaningful and critical scrutiny of MMS's reasons and the record. ATP contends the Board did not follow its own rules, regulations, and policies. ATP argues that there is no requirement in the regulations that ATP obtain an approval of an EP and APD in order to receive a SOO and that such a requirement would contradict the new flexible policy in the Lack-of-Rig NTL. ATP argues that it satisfied the requirements for a SOO and that MMS personnel based the decision on personal opinions that did not involve the new policy. ATP contends that the Board erroneously held that MMS's action did not amount to the grant of a *de facto* SOO, despite evidence to the contrary. ATP argues that MMS's behavior led ATP to believe that its actions were in accord with all MMS requirements and that it had nothing more to do to obtain the SOO.

The Board summarized its decision as follows:

> We find no basis for concluding that MMS abused its discretion by denying an SOO, where, on the facts of record, no EP was filed sufficiently in advance to support a reasonable expectation that, under agency rules, it necessarily would be approved before the lease expired.
> MMS reviewed the situation and correctly found that even if weather conditions were ideal and a rig was available to drill the well to total depth, a well could not have been drilled because ATP lack required approvals to do so. . . .
> But the question of whether weather, loop currents, or delay in securing a rig prohibits drilling only arises when the lessee has "a drilling rig [that] was contracted and scheduled to begin leaseholding operations <u>prior</u> to the lease expiration." NTL 2006-G02. We need not speculate whether MMS might have

> approved the EP and APD, even ones filed so close to a lease expiration date, if ATP had contracted for an appropriate drilling rig and scheduled it to begin leaseholding operations prior to the lease expiration. As shown above this never happened.
>
> . . . . It follows that ATP never had a contract to drill any well on Block 943. Thus, ATP never had "a drilling rig [that] was contracted and scheduled to begin leaseholding operations <u>prior</u> to the lease expiration. NTL 2006-G02.
>
> Further, we find no evidence of bias. The e-mail comment that ATP finds so offensive merely expresses an opinion on the facts that we have identified from this record; it is those facts that defeat ATP's appeal, not the MMS employee's comments. Moreover, rather than bias, we see MMS as having attempted to keep the lease alive even after it expired by its own terms. But even 30 days after lease expiration, ATP could find no option to conduct lease activities, and so MMS allowed the EP and APD, without the amendment that would have been required, to go unapproved.
>
> Finally, we find no basis upon which to conclude that Don Howard's e-mail communications constituted the approval or basis for *de facto* suspension that ATP approved lease activity that MMS's detailed regulations required. An approved EP and APD were required before any lease activity or operation could be initiated. . . . [I]t seems clear to us that Howard conditioned his communications on the understanding that the rig in question would ultimately be able to drill to total depth, a matter which was never true.

The court concludes that ATP has not established that the Board's decision was not a reasonable interpretation of the agency's regulations. The NTL 2006-G02 represented a temporary policy for granting a SOO. Under the previous policy, the applicant for a SOO had to present an executed contract for a rig; a schedule for beginning operations prior to the lease expiration; an approved plan such as an EP; and an approved APD. MMS could approve a SOO when operations were delayed for reasons beyond the lessee's control.

Under the temporary policy, in addition to the delays previously considered by the MMS, the MMS may grant a SOO if the lessee could demonstrate that a timely search had resulted in a lack of rigs capable of drilling prior to lease expiration, and a drilling contract had been executed

11

prior to the lease expiration, even if not scheduled to begin until after the expiration of the lease. Further, MMS may approve a SOO under the temporary policy upon a showing that attempts to secure long lead equipment to begin operations prior to lease expiration were unsuccessful, and a contract had been executed, indicating the expected delivery date and an explanation of why the equipment will not be delivered prior to the lease expiration.

The court concludes that the temporary policy added the type of delays the MMS could consider, specifically those that resulted in an inability to begin drilling prior the lease expiration. The temporary policy did not change the requirement of an executed contract for a drilling rig, an EP and an APD. Under 30 C.F.R. § 250.175(a), a SOO may be granted "when necessary to allow you time to begin drilling or other operations when you are prevented by reasons beyond your control, such as unexpected weather, unavoidable accidents, or drilling rig delays."

ATP did not succeed in obtaining a commitment from Diamond to drill a deeper well. By the time there was an agreement to spud the well at 1100 feet, ATP knew that the loop currents would prevent Diamond from mooring the rig. Diamond would not permit the rig to be used for temporary operations until the mooring issue was settled. On July 27, 2006, ATP advised MMS that it could not work out the arrangements with Diamond. Therefore, notwithstanding that ATP did not have an approved EP and APD, there is no genuine issue of material fact that ATP did not meet the requirement that a contract to begin drilling operations had been executed. The Board was reasonable in its conclusion that ATP has no basis for confusion over having to obtain approval of an APD to drill a well.

Moreover, ATP has not established that the Board incorrectly found that there was neither bias nor a *de facto* suspension. Even if a MMS representative had a negative opinion of ATP's application for a SOO, the MMS followed its regulations in denying the SOO because ATP did not have an executed drilling-rig contract or an approved EP and APD. Further, after the expiration date of the lease, MMS personnel continued to communicate with ATP. There is no authority for classifying this extended cooperation as a *de facto* suspension.

Accordingly, the decision of the Board was not arbitrary, capricious, or otherwise not in accordance with the law in affirming the MMS's denial of the SOO, and the defendants are entitled to judgment as a matter of law.

**2. Board's failure to articulate basis for denying a hearing**

ATP denies that a dispute exists as to any material fact supporting the grant of a SOO; however, to the extent that there is a genuine issue of fact, ATP argues that it is entitled to a hearing before an ALJ. ATP contends that, by denying a hearing, the Board deprived it of an opportunity to adjudicate the claim that MMS's actions amount to the grant of a SOO and to show that the facts do not constitute substantial evidence to support the Board's decision.

The Board denied a factual hearing for the following reasons:

> We find no basis upon which to conduct a factual hearing. The record is clear; ATP's intentions in conducting communications with Diamond or MMS cannot obscure the fact that it never was able to contract a schedule to begin leaseholding operations on Block 943 prior to lease expiration.

ATP does not identify material issues of fact that were not resolved and that require a hearing before an administrative law judge. Accordingly, ATP has not established that the

Board's decision in denying a hearing was arbitrary, capricious, or otherwise not in accordance with law.

### III. CONCLUSION

There are no genuine issues of material fact, and the defendants are entitled to judgment as a matter or law. The defendants' motion for summary judgment is granted, and ATP's motion for summary judgment is denied.

New Orleans, Louisiana, this  26th day of August, 2009.

_____
**MARY ANN VIAL LEMMON
UNITED STATES DISTRICT JUDGE**